Nazareth GATES et al., Plaintiffs,

v.

John COLLIER et al., Defendants.

No. GC 71–6–K.

United States District Court,
N. D. Mississippi,
Greenville Division.

Nov. 19, 1976.

Ronald Welch, Jackson, Miss., Shawn F. Moore, Justice Dept., Washington, D.C., for plaintiffs.

Roger Googe, Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In supplemental proceedings since October 31, 1975, the date of our last substantive decision dealing with the Mississippi State Penitentiary, *Gates v. Collier,* 407 F.Supp. 1117 (N.D.Miss.1975), this court has issued a series of orders and conducted several hearings addressed primarily to (a) establishing a timetable for eliminating inmate housing units unfit for human habitation and constitutionally condemned, and (b) mandating a ceiling on inmate population of the remaining housing units to avoid constitutionally intolerable overcrowding of inmates.

On June 7, 1976, this court, taking judicial notice of statutes passed by the Mississippi Legislature at the 1976 Regular Session,[1] deemed it to be in the interest of justice to proceed forthwith to issue supplemental orders and provide instructions designed to carry out this court's mandate of August 7, 1975.[2] This action was taken by us despite an appeal prosecuted to the Fifth Circuit by counsel for the prison inmates and United States Department of Justice from the August 7, 1975 order because of dissatisfaction with our action in not earlier closing the six designated camps. The defendants[3] were directed to prepare and submit a plan of implementing the court's August 7, 1975 order taking into account the closing of Camps 4 and B as of July 1, 1976,[4] as well as the January 1, 1977 closing of Camps 10B and 11, and providing for the establishment of an inmate population to be accorded 50 square feet of living space per inmate by January 1, 1977. Defendants' plans for population reduction were ordered to be filed not later than July 9, 1976, with copies served upon counsel opposite, who were permitted to file objections to such plans.[5]

1. Senate Bill No. 3008 (appropriation for support and maintenance of the state penitentiary for the fiscal year 1977; Senate Bill 3044 (making an appropriation to the State Building Commission for the purpose, among other things, of constructing at the penitentiary a medical facility and two housing units to house 192 inmates each); Chapter 440, General Laws of Mississippi, originating as House Bill No. 1479, and known as the "Mississippi Corrections Act of 1976", effective as of July 1, 1976 (to establish a Department of Corrections; to establish a Commissioner of Corrections and deputies thereof; to set forth the powers and duties thereof; to provide that the Department shall be the administering agency for the Parole Board; to redesignate the Probation and Parole Board as the Parole Board, and for other purposes).

2. The pertinent portions of the August 7, 1975 order directed the closing of Camps 4 and B by July 1, 1976, Camps 10B (old Camp 10) and 11 by January 1, 1977, and Camps 8 and 9 by July 1, 1977. In addition, the order placed "a ceiling upon the number of inmates to be housed at each of the penitentiary housing units in use from and after January 1, 1977, "based upon a minimum living space of 50 square feet per inmate at each unit. Moreover, the order reserved the question of "ordering the closing of other old housing units which may remain unfit for human habitation."

3. Dr. Ellis MacDougall, then acting as Superintendent of Mississippi State Penitentiary as well as Acting Commissioner of Corrections, was added as a defendant; Jack K. Reed, former Superintendent having been relieved of office, Liberty Cash, Jr., Acting Superintendent, as well as Honorable Charles C. Finch, Governor, who had succeeded the Honorable William L. Waller, were substituted as parties defendant pursuant to Rule 25(d), F.R.Civ.P.

4. This date was extended by the court until July 31, 1976.

5. At this point added defendant summons were also issued and served upon those persons selected by the Governor on or after July 1, 1976, as the chairman and members of the Board of Corrections, as well as the Commissioner of Corrections, the Deputy Commissioner of Institutions, and the Warden of the Parchman facility. Since that date, Dr. MacDougall has been replaced as Commissioner of Corrections by Dr. Allen Ault effective November 15, 1976, and Liberty Cash, Jr. has been replaced as

By their plan defendants represented that the allowable population based on the 50 square foot formula would be 2214, as of January 1, 1977.[6] Defendants' projected total inmate population as of January 1, was to be 2619, taking into account the current rate of increase of 20 new inmates per month in excess of those discharged. By their plan defendants estimated that 400 inmates would be discharged under the "early release" program authorized by § 79 of the Mississippi Corrections Act of 1976, with inmates to be processed for such release at the rate of 25 in July, 100 in August, 150 in September, 75 in October, and 25 in November. The plan did forecast that variables might result during the last half of the calendar year as the result of "proposed variance such as interview rate of the releasees during the gearing up months of July and August, 1976." The plan emphasized that the early releasees would not include the number to be released on work release or on regular parole, and anticipated that these methods of reduction, plus reduced intake due to nonincarcerating-type sentences, would by January 1, 1977, bring the projected population to 2129, or well within the allowable maximum. Counsel for plaintiffs and the Department of Justice vigorously contested the projections.

## AUGUST 16 HEARING

The uncontradicted testimony was that on July 15, two new 162-man housing units opened to provide a total of 324 bed spaces; by July 31, 1976, Camps 4 and B were closed, deleting 302 bed spaces, yielding a net gain of 22 bed spaces. During August, a new medium security facility was completed providing 192 bed spaces for single-cell occupancy. The new reception center, formerly the women's camp, was renovated and practically ready for occupancy, thus providing 105 bed spaces, but this will be more than offset by the closing of Camps 10B and 11 with the elimination of 297 beds. However, it is significant that about to be started with appropriated available funds and completed construction scheduled for March 1977 are two new medium security units, already designated as Camps 25 and 26, which will add 384 additional beds.[7]

It should be noted that the State Legislature in 1976 did appropriate three and one-half million dollars for the construction of a new medical-dental facility, thus endeavoring to correct a gross constitutional shortcoming. Bids for this facility are to be received from contractors this fall with the construction time, of course, extending over a period of many months.

Dr. MacDougall, in explanation of the population reduction plan, testified that in addition to the work release program, parole program, and the early release program, alternative plans under consideration would be (a) to vest the Commissioner of Corrections with the decision-making power on work release instead of the Parole

Warden of the Parchman facility by John Watkins as of November 1, 1976. Ault and Watkins, and to the extent that MacDougall may retain official status as a corrections official or consultant, are automatically substituted as parties defendant pursuant to Rule 25(d), F.R. Civ.P.

6. The number was first reported at 2253, but Dr. MacDougall stated that this number should be revised to 2214. The new capacity figure included 10 inmate spaces from the fire house and 8 inmate spaces from the farm rehabilitation unit inadvertently omitted, and corrected an overstatement of bed capacity of the women's camp when renovated for use as a reception center. According to Dr. MacDougall, with these corrections made, the total rated capacity would allow for 2214 inmates with

Camps 10B (old Camp 10) and 11 closed on January 1, 1977. (October 4, 1976 hearing, Tr. 48).

7. Dr. MacDougall testified that some delay in the award of the construction for these particular units has been occasioned by design alterations to make them, originally planned on an open dormitory style, to be later converted into smaller type of housing units, "I have redesigned the two units we have talked about and we will end up with a better facility, being able to at least be able to move the inmates to individual rooms rather than to dormitories. They have delayed construction of those two units by about 60 days, but I don't anticipate any longer delay than the 60 days . . . .." (Tr. 27).

Board, (b) to place inmates in county jails around the state, if necessary, since he had ascertained that more than 450 beds were so available, and (c) the use of the Governor's power to suspend sentences. In MacDougall's view, the last three mentioned alternatives were regarded as "cushions" to fall back on only if problems were encountered with the functioning of the other portions of the reduction program. (Tr. 14).

MacDougall, whose credentials as an experienced correctional official in the States of Georgia, South Carolina, and Connecticut are of the highest order, testified that he had also met with approximately 20 state circuit judges and some 15 to 20 district attorneys to explain to them "problems at Parchman that we face, not only the physical plant, but the general conditions there, but also of the mandate to meet the court's order by January 1 of 1977. And in enlisting their support and aid in helping me meet that order and to look at how we could have a better system in the future." (Tr. 23). MacDougall emphasized the importance of presentence investigation reports prepared by qualified investigators and timely made available to the sentencing judges as an aid for ameliorating the overcrowded conditions at Parchman. He based this, concededly, on the assumption that some institutional sentences might be shortened, and probation and noninstitutional sentences more generously used by state judges having access to more comprehensive information about the offender at the time of sentencing.

On cross-examination, MacDougall acknowledged that under the work release program no inmate may be released in any county in Mississippi until the county sheriff and senior circuit judge have been notified in writing 30 days prior to release, in which event objection from those officials or district attorney would block the release to that county. Section 77, Mississippi Corrections Act. It was also undisputed that available county jail bed spaces could be used by the Corrections Department as a place for confining convicted felons only upon the Commissioner's first obtaining consent of the local jail authorities and fully reimbursing them for all costs incurred by such confinement. Section 74, Mississippi Corrections Act.

MacDougall testified that the information which had been developed at the penitentiary revealed that 730 offenders were entitled to receive a one-year reduction in eligibility for parole, and thus qualify for release under the "early release program" but he had to acknowledge that under the new Act the Parole Board, and not he, decides who may be released under the early release program. Section 80 of the new Act explicitly provides that the State Parole Board "shall have exclusive responsibility for the granting of parole" of any type. The official also acknowledged that only 46 probation and parole officers are presently employed by the Corrections Department, and they have supervision responsibility through parole or probation of 2400 people. The average caseload for such an officer might vary, he opined, from 35 to 130 (Tr. 43–44), but he was hopeful of receiving funds with which to begin a program of volunteer probation officers.[8]

Dr. MacDougall candidly stated that dormitory-type facilities at a penal institution were undesirable in that they posed problems of dangers to inmate assaults by inmates as well as to staff. He was quite frank to say, in answer to the court's question, that with the housing presently existing at Parchman, there was inadequate civilian security personnel to maintain order in these dormitories. He was of the opinion

---

8. It seems incredible to accept Dr. MacDougall's postulate that one-third of the inmates at Parchman had been incarcerated by sentencing judges without the benefit of presentence investigation reports. We are inclined to believe this premise may well be exaggerated in MacDougall's mind because of the likely failure of some courts in the past to send to Parchman many presentence reports upon which sentences were based. More probably, a failure of communication between sentencing judges and the Parchman officials is a better explanation of why the Parchman officials had no record of presentence investigations in the penitentiary files on a large number of prisoners.

that to properly do so, "it would require that we have officers assigned to each dormitory, especially during the hours that the inmates are in there. At this point we don't have enough officers to maintain that kind of security in these facilities, . . . we will usually have one or two officers on duty in the halls in the evening hours. The *optimum* is that we would have one officer in the hall and one in each dormitory in each facility." (Tr. 64–65) (Emphasis added).[9]

As regards the early release program, identifying inmates potentially subject to such early release, prison officials had screened 730 inmates to determine that 100 would have jobs upon release. No inmates, however, were released in July on early release, contrary to the defendants' original projection of 25. The penitentiary officials recommended 41 to the Parole Board at its August 13 meeting. Of that number, the Parole Board in August saw fit to grant early releases to 22, in contrast to MacDougall's expectation of 100 for that month. It did appear, however, that prison officials had processed an additional 30 inmates for early consideration by the Parole Board at its next meeting.

These facts caused the court, in an informal bench ruling (Tr. 166–170, 171–172) to express considerable doubt that defendants' plan, though commendable in many respects, might be realistically expected to attain its year-end goal. It had achieved small success during the months of July and August. The court nevertheless recognized that the early release program and other efforts to educate the authorities, some of whom were only recently appointed to their official positions, to the necessity of reducing unconstitutional overcrowding was in its initial stage of implementation, and that additional time would not only allow the court to make a better judgment of the situation but provide the Department of Corrections, including the Parole Board, further opportunity to develop effective procedures to bring the inmate population figures into harmony with the orders of this court and consistent with constitutional housing now existing or to be hereafter built at Parchman.

Our conclusion was, therefore, to defer action in view of expectations of prison officials that by October 1, 275 inmates should or might be accorded early release over and above those subject to work release or subject to regular parole, in which case a great part of the overpopulation problem would be resolved. Should that eventuality not come to pass, overcrowding would continue to exist, with less time to accomplish population reduction to constitutional levels by January 1, 1977. Uncertain that defendants' goals could be achieved, the court declined to enter a definitive judgment prior to October 1976, thus permitting defendants to go forward with all available resources, to accomplish a greater measure of prison depopulation through all lawful means. We thereupon recessed the evidentiary hearing until October 4, and directed that further evidence be then taken on the overcrowding problem, as well as on recent motions by plaintiff-inmates and by the Department of Justice to increase the number of camps that should be declared unfit for human habitation and to

---

**9.** At the subsequent hearing held October 4, MacDougall was pressed by counsel for plaintiff-inmates that Parchman's dormitory facilities did not afford adequate protection of inmates from other inmates as well as for staff. Asked if he still adhered to that same opinion, MacDougall stated:

A. I think, if I remember correctly, my statement was was [sic] that under any circumstances, whether it's a prison, a college or any place else, when you have people living in dormitory housing, there is much more opportunity for people to be assaulted than in individual-room houses.

Q. You don't recall your comment when the Court asked you about protection and you said that you did not have enough security? A. I have said that if we operated the whole place as maximum security we wouldn't have enough officers to put everybody in the complement that I would desire. I think I responded to the Court just a few minutes ago that the effort is to identify the areas where we have the problems and try to complement them. Obviously by my request for 50 additional officers in the next session of the legislature I have indicated that we need more officers, yes. (Tr. 85, 86).

accelerate the date of their closing. This latter aspect of their motion is, to some extent, a restatement of the issues on their appeal pending in the Fifth Circuit.

### OCTOBER 4 HEARING

At this second hearing the court received evidence in two aspects. The first was an amplification or update of progress by defendants toward reducing inmate overcrowding by January 1, 1977. The second part of the hearing dealt with the present condition of certain inmate housing camps which were the subject of elimination and early closing sought by the motions of the plaintiff-inmates and the Department of Justice.

(a) *Overcrowding.*

With respect to progress as to reducing inmate population attained by October 1, Dr. MacDougall again appeared as the only witness for the State. His testimony was based on more sanguine data than his original August projections. He first established that inmate population had declined monthly from July 1 to October 3, resulting in a net reduction of 139 (Tr. 44). This reduction was achieved as follows:

```
a.  Work release:
    July          24
    August         7
    September     26
    October        2      59

b.  Regular parole:
    July         106
    August        93
    September     37     236

c.  Early release:
    July           0
    August        22
    September     48      70    365
```

MacDougall's prognosis was that between October 3 and January 1, 1977, he "anticipated" 300 additional inmates will be considered and processed for parole, and of this figure 211 will make parole (Tr. 46).

Against MacDougall's actual calculations to date, the court notes that the prison population on June 1, 1976, was 2,479. Between June 1 and October, releases through work release, regular parole, early parole, and discharged upon expiration of sentence exceeded new commitments and parole revocations by 127, resulting in a net inmate population of 2,352 on October 3. However, between October 3 and November 7, the inmate population had a net *increase* of 5, resulting in a total inmate population of 2357. The total inmate population, then, was reduced by 122 from June 1, 1976 to November 7, 1976—a five-month period. To meet the January 1, 1977 allowable population of 2214, corrections officials must further reduce the population by 143 inmates over only a six-week period. (See Daily Movement Sheet dated November 7, 1976). It thus becomes apparent that MacDougall's anticipation that additional inmates in some number were being processed and were in various stages of release, either on work release or on regular or early parole, during the months of October, November and December, or prior to the January 1, 1977 deadline, remains largely a matter of speculation. This is necessarily so, since the final decision in all cases for release or parole is the exclusive responsibility of the Parole Board. That Board, in addition to requiring an inmate to have a job upon being granted work release and requiring approval of local authorities of the county of release, utilizes discretionary criteria, independent of the Commissioner of Corrections, for granting favorable consideration for inmate parole of any fashion. Also, MacDougall's estimate that there would be an average of 20 inmates per month less entering the prison due to increased use of diversion techniques by sentencing judges, presumably through greater use of probation, suspended sentences, fines and other noninstitutional sentences, also was based on surmise.

Dr. MacDougall expressed optimism that the court-ordered mandate could be achieved in time to avoid resorting to extraordinary measures, though he did acknowledge that his appointment as Commissioner of the State Department of Corrections would soon end, that he would resume professional work in another state after endeavoring to secure qualified correction personnel to recommend to the Board of

Corrections and the Governor for the positions of Commissioner of Corrections, Deputy Commissioners, as well as for Warden of the Parchman penitentiary. MacDougall's population summaries based on experience during his three months of contact with Mississippi's prison, and his projections for October, November and December were tabulated and offered in evidence. (D. Ex. 1). The vital part of that exhibit (page 3) which the court adopts as not only accurate but of basic legal significance to Parchman's future, relates to three pertinent categories:

|  | ACTUAL CAPACITY 10/1/76 | COURT ORDERED CAPACITY 1/1/77 | REVISED CAPACITY 1/1/77 |
|---|---|---|---|
| CAMP 1 | 139 | 139 | 139 |
| 2 | 103 | 103 | 103 |
| 3 | 55 | 55 | 55 |
| K-9 | 10 | 10 | 10 |
| 4 | 168 | 168 | 168 |
| 5 | 127 | 127 | 127 |
| 6 | 120 | 120 | 120 |
| 7 | 100 | 100 | 100 |
| 8 | 134 | 134 | 134 |
| 9 | 76 | 76 | 76 |
| 10 | 100 | 100 | 100 |
| 10 ext. | 92 | closed | closed |
| 11 | 91 | closed | closed |
| 12 | 100 | 100 | 100 |
| 20 | 100 | 100 | 100 |
| FRONT | 40 | 40 | 40 |
| 22 | 162 | 162 | 162 |
| 23 | 162 | 162 | 162 |
| 24 | 192 | 192 | 192 |
| HOSPITAL | 50 | 50 | 50 |
| BEEF UNIT | 21 | 21 | 21 |
| MAX. SEC. | 52 | 52 | 52 |
| WOMEN | 72 | 72 | 72 |
| WOM. PRE. | 8 | 8 | 8 |
| FIRE HOUSE | 10 | 6 | 10 |
| FAM REHAB. | 8 | omitted | 8 |
| REC. CENTER | not completed | 156 | 105 |
|  | 2292 | 2253 | 2214 |

In answer to the court's question, Dr. MacDougall stated that there was minimum time lag between recommendations by the penitentiary officials of inmates for parole and consideration by the Parole Board. He explained that the procedure is first to have an inmate, otherwise eligible, seen by a psychologist or psychiatrist for evaluation, evaluated by the prison staff on the basis of his record and other pertinent data (employment always being required for a work releasee), and for the inmate to be submitted to the Parole Board; that the Parole Board, newly organized since July 1, 1976, met twice in July, 4 times in August and 6 times in September and an unspecified number of times in October. On cross-examination MacDougall explained that processing of an inmate, whether on work release or parole, denoted that all conditions had been satisfied both by prison officials and the Parole Board, subject only to the finding of employment for those to be accorded work release and also subject to the objection on the part of local authorities of the counties to which the parolees or work releasees might intend to go (Tr. 59–63).

(b) *Inmate Housing.*

By motion for supplemental relief, the Justice Department asks the court to supplement its previous orders to advance the date of closing for Camp 8 from July 1, 1977, and to order the immediate closing of Camps 5 and 6 due to the egregious conditions found to exist in them. The private plaintiffs not only seek to advance the closing dates for Camp 8, but also Camps 10B

and 11 already ordered to be closed January 1, 1977. Plaintiff-inmates further seek an order directing the closing of all dormitory-type camps that do not meet constitutional standards, specifically Camps 5, 6 and 8, as well as Camps 1 and 2.

A brief summary of our prior orders and findings relating to the constitutionality of the housing units at Parchman should be set out before proceeding to dispose of this aspect of the case. In our original opinion, *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss. 1972), aff'd 501 F.2d 1291 (5 Cir. 1974), we found that the housing units at Parchman, in general, were unfit for human habitation under any modern concept of decency, finding that most housing units were woefully inadequate and far below minimum standard requirements for buildings to be used for inmate housing. Finding that housing inmates under such conditions deprived the inmates of their constitutionally-protected right to adequate provision for their physical health and well being, we enjoined defendants to make those improvements and expenditures for installation and renovation of living quarters which were specified by the Mississippi Joint Legislative Committee report on the Mississippi State Penitentiary. On December 13, 1974, the private plaintiffs, dissatisfied with progress in the housing conditions, moved for further relief. In January 1975, the court took evidence on this motion and found that, as in 1972, many, if not most, of the old housing units remained in an appalling and deplorable condition unfit for human habitation. To remedy these constitutionally impermissible conditions, defendants were on February 3, 1975, ordered, inter alia, to establish a timetable for elimination of those camps unfit for human habitation. After consideration of the defendants' plan then submitted and plaintiffs' objections thereto, the court, on August 7, 1975, after noting that some renovation work had been performed on some of the older camps, nevertheless found that unconstitutional conditions persisted and established the following timetable for closing six of the old camps: Camps B and 4 by July 1, 1976, Camps 10B (old Camp 10) and 11 by January 1, 1977, and Camps 8 and 9

no later than July 1, 1977. The court expressly reserved the ordering of the closing of other housing units which were permitted to remain unfit for human occupancy.

Evidence was submitted on the issues raised as to the closing of additional housing units as requested in plaintiff-intervenor's motion for supplemental relief, and joined in by plaintiff-inmates. The testimony and evidentiary materials then submitted in support of the motion were primarily directed at Camps 5, 6 and 8. Significant testimony as to the present condition of those three units was given by Theodore James Gordon, Chief of the Institutional Hygiene Division of the Bureau of Occupation and Institutional Hygiene for the District of Columbia Environmental Health Administration. MacDougall acknowledged that he publicly stated upon his arrival in Mississippi that the Parchman facilities (i. e., the old housing units) were in the "worst physical condition" of any prison he had ever seen (Oct. 4 hearing, Tr. 74). MacDougall caused the Board of Corrections to employ Rosser, White, Hobbs, Davidson, McClellan & Kelly, Inc., an Atlanta engineering firm specializing in penal facilities to evaluate Parchman's physical structures and make report thereon. In this manner the Rosser report was made available, providing certain data on inmate housing conditions at Parchman. In addition, the State Fire Marshal, at the court's request, prepared a report on general conditions, with special emphasis on fire safety hazards in Camps 5, 6 and 8. A previous survey of the housing units by Brewer & Godbold of Clarksdale, Mississippi, submitted by defendants in support of their 1975 plan filed with the court, likewise contains information pertinent to the supplemental relief requested as to Camps 5, 6 and 8. It was the Brewer report upon which the court primarily relied in its initial order for determining the priority of housing units to be closed for human occupancy.

The Rosser report indicated that the physical deficiencies present in Camps 5, 6 and 8 are shared with most, if not all, of the

older housing units at Parchman. It was reported that Camps 5, 6 and 8 continue to suffer from gross deficiencies which result in the buildings' failure to conform to any minimum standards for inmate housing. Some deficiencies noted in the Rosser report were designated as "urgent items", i. e., items which must be corrected to avoid inmate illness or loss of life. These urgent items included use of unvented open-flame heating systems, inappropriate for use in installations of this type, lack of water heater gas vents and lack of water heater pressure relief valves designed to prevent explosion of the heater in event of burner control malfunction, dangerous electrical wiring presenting shock and fire hazards, cross-connections between potable, or domestic, water and waste water, which could allow raw sewage to enter the domestic water supply, threatening inmate health, and the discharge of raw sewage matter in open ditches or into septic tanks that allow raw sewage to pool and stand. Other serious deficiencies noted by the Rosser report common to these three camps which required corrective work to bring the units up to minimum standards included lack of toilet area ventilation, contributing to propagation and growth of airborne biological organisms and a generally unhealthy environment, inadequate living area ventilation, and exposed concrete floors so cracked and worn as to encourage the growth of bacteria and other organisms from the accumulation of particles of food and other waste in the cracks and worn floor surfaces. The condition of these floors also provides an excellent medium for the spread of contagious diseases and also encourages insect and vermin infestation.

As to the general condition of Camps 5, 6, and 8, the Rosser report found that all required extensive repair, all had improperly sealed windows and doors permitting excessive air and water infiltration, and inadequate lighting. Toilet rooms and fixtures were in poor condition, and the ceilings throughout these buildings need to be either totally replaced or extensively repaired.

The State Fire Marshal's report contains findings which corroborate the Rosser report. As to the general structural condition of Camps 5, 6 and 8, the Fire Marshal found noticeable deterioration to the wooden portions of all structures, including the window and door units, and also noticeable deterioration of ceiling areas, attic areas and composition shingle roofing. In Camp 5, the Fire Marshal found several fire safety hazards, including conditions caused by the deplorable electrical system, and a lack of proper valves on gas appliances. He found similar safety hazards in Camps 6 and 8. Additionally, in Camp 6 the Fire Marshal found a 250-gallon propane tank situated adjacent to the building and on the bare ground, in violation of applicable codes. This gas tank also was fitted with an improper regulator, and supplied gas into the camp by means of an exposed copper tube running through a window, presenting the obvious danger of a break in the line.

Theodore James Gordon's testimony was in general accord with both the Rosser report and the Fire Marshal's report. In addition, Gordon testified that on his survey he found Camp 8 to have roach infestation, and a serious problem with house flies. When first visiting Camp 8, he noted that many plumbing fixtures were inoperative, and were full of human excrement. This environmental expert testified that the food service facilities in Camp 8 as well as in Camps 5 and 6 were unsanitary from the standpoint of basic cleanliness and maintenance, especially as to food contact surfaces and the location of storage of common eating and drinking utensils. The food service conditions, according to Gordon, had an obvious potential for causing the occurrence of food-borne diseases.

As to Camp 6, Gordon testified that he found evidence of rat and fly infestation caused by poor handling of garbage, including the use of large open trash cans and the presence of garbage scattered around the dumpster located near the camp. A problem noted by Gordon as to Camp 5 not already covered above was the presence of a large stagnant pool located near this

camp, which produced a breeding ground for mosquitos.

On the basis of his survey, Gordon unequivocally testified that Camps 5, 6 and 8 failed to meet any minimum health environmental standards for inmate housing, and should without doubt be closed.

The defendants sought to dispute certain statements made by Gordon, and offered photographs depicting the relative cleanliness of toilet areas and other improvements which, according to Gordon, had been rectified between his August and October 1976 visits. The court also received photographs of the new structures provided for the first offenders camp, the new medium security unit, the firehouse, water tower, and other facilities which graphically reflected modernization of such facilities, which had been financed with state and federally provided funds.

### (c) The Court's Inspection.

At the conclusion of the October 4 hearing, the court advised the parties it would delay ruling until receipt of the Rosser report by November 1 and would itself make a personal tour to inspect the present conditions prevailing at Camps 5, 6 and 8. This tour was made on October 7.

The court's own observation of Camps 5, 6 and 8 verified much of the testimony of Gordon and many of the findings set out in the Rosser report and the Fire Marshal's report. There was no evidence of any substantial or basic repairs, apart from installation of toilets and some kitchen equipment, having been made in recent years. In addition to the conditions already noted, the court on its tour of Camp 8 found filthy water standing in an open pipe chase in one of the bathrooms, and also found the refrigeration unit in the food storage cooler leaking water into the storage area, presumably causing the noticeable odor of rotting vegetables; and in Camp 6, the heater in one dormitory area was inoperative—this could have gone unnoticed if the day had not been chilly.

On the cumulative data contained in the Brewer report, the Rosser report, the Fire Marshal's report, Gordon's testimony, and our observations, we have no difficulty in agreeing with Gordon's assessment of which camps should be marked for priority of closing—Camp 8, by all odds, was the worst, its dilapidated condition having steadily worsened during the past year. Camp 6 easily qualifies for closing no later than Camp 8. Camp 5 should likewise no longer be used for human occupancy. Whether the Legislature may see fit to expend funds ($775,000) to renovate these three camps in an effort to upgrade them for temporary use, in line with constitutionally acceptable standards, it must not overlook the basic unsuitability of dormitory design because of inadequate protection for inmates and security personnel from inmate assaults.[10] The penologists who have testified in previous hearings, are in complete accord with MacDougall's assessment that open dormitory housing, particularly with bathroom and shower areas beyond the watchful eye of correctional guards, present special danger of serious inmate assaults from other inmates, as well as to staff.[11]

It would be a misreading of the Rosser report to conclude that an expenditure of $2,500,000 on all old housing units will render them acceptable even for temporary use, absent additional affirmative steps to provide reasonable protection to the inmates and staff from such hazards. The Rosser report does not address the manner of accomplishing these additional steps, nor does it undertake to estimate the cost there-

---

**10.** Representative reports since 1975 reveal 20 inmate assaults, including 2 reported homosexual rapes at Camp 8, 42 inmate assaults, including 6 homosexual rapes at Camp 5, and 28 inmate assaults, including 4 homosexual rapes at Camp 6. The evidence is without dispute that the bathroom and shower areas in these camps are so situated as to be beyond the surveillance of hall officers, and often become the critical situs for inmate misconduct.

**11.** Presumably this is why the Rosser report indicates that the older camps, even if renovated in accordance with the report, will remain fit only for temporary use for minimum security purposes.

of to comply with constitutional standards. The Rosser report, taken in its true perspective, poses to the Legislature as well as to the public the wisdom of making substantial expenditures on any of the older housing units, including those not presently ordered to be closed, in the expectation that any of them may long remain usable for housing of inmates classified as gunmen.[12] The basic problem yet to be addressed by the Legislature is whether to incur expenditures of large sums of State money, without LEAA contribution for additional inmate housing at the Parchman facility, or whether to disburse certain portions of the penitentiary population, such as the women's camp or the first offenders' camp or other specialized groups, to locations elsewhere than Parchman, in the hope of gaining maximum financial assistance from LEAA to construct the inevitably necessary new inmate housing, if, as seems likely, the overall size of the incarcerated population will continue to increase.

### (d) *Maintenance of Housing Facilities.*

The court has, in various prior evidentiary hearings, heard testimony of the accumulation of filth, debris, raw sewage, waste water, contaminated food service and other factors adversely affecting environmental health, the severity of which has varied from camp to camp. Often it has seemed that certain camps, which are primarily supervised by camp sergeants, were far more poorly maintained in these areas than other camps. We are convinced from Gordon's testimony (Oct. 4, Tr. 183–189) that the lack of minimum standards for environmental health service and a uniform maintenance program contribute greatly to the breeding of unsanitary, indecent and intolerable conditions of unhealthiness which are of constitutional significance. The key to an adequate and decent maintenance program, avoiding imminent danger to inmate health, is the availability of supplies and close supervision by the correctional authorities.

In this respect, Gordon testified that the maintenance policy at Parchman was "a problem" because of shortage of staff, with maintenance people using inmate labor as best they could to maintain the physical facilities. Gordon ascertained there was no written preventive maintenance program, i. e., no written housekeeping schedule establishing routine maintenance for each of the housing units designating who should do specified tasks, when and how often they should be done, and fixing supervisory responsibility. The following colloquy appears between the court and Gordon (Tr. 90):

Q. All right, did you get the impression that housekeeping was left up to the sergeants of each camp?

A. No, your Honor, I was left with the impression that housekeeping was left up to the inmates as best they could make it.

It is unnecessary to detail the instances of poor maintenance grossly detrimental to environmental health which Gordon, as well as other witnesses at prior hearings, found not only at the camps ordered to be closed but at many of the other housing units not presently under critical review.

### LEGAL PRINCIPLES

■ We restate settled principles of federal jurisprudence, i. e., that constitutional treatment of human beings confined to penal institutions is not dependent upon the willingness or the financial ability of the State to provide decent penitentiaries. A federal court may not withhold its equitable powers indefinitely to allow the State to decide upon a corrections program which may encompass a dispersion of certain classes of offenders to different locations, thus gaining substantial LEAA assistance, or, in the alternative, to use its own resources to overcome decades of official neglect and public apathy to bring the Parch-

12. We express no opinion of the usability of older units for purposes other than inmate housing.

man facility, as the sole adult prison, into harmony with the United States Constitution. See *Finney v. Arkansas Board of Corrections,* 505 F.2d 194 (8 Cir. 1974); *Wyatt v. Aderholt,* 503 F.2d 1305 (5 Cir. 1974); *Holt v. Sarver,* 309 F.Supp. 362 (E.D. Ark.1970), aff'd 442 F.2d 304 (8 Cir. 1971).

■ We are persuaded by uncontradicted expert testimony that 50 square feet of living space per inmate is the minimal acceptable requirement to comport with the Constitution. No one takes issue with this basic requirement for human decency, and this court holds a failure to achieve that minimal standard contravenes the Eighth Amendment prohibiting cruel and unusual punishment.

After mature consideration, the court modifies its prior order of August 7, 1975, to mandate the closing of Camps 10B (old Camp 10) and 11 by January 1, 1977, and to accelerate the closing of Camp 8 to April 1, 1977, and further direct the closing of Camps 5 and 6, also on April 1, 1977. The court reaffirms the order closing Camp 9 by July 1, 1977. These closings will materially affect the maximum capacity as set forth below, allowing the housing of not more than 2141 inmates as of July 1, 1977, with distribution strictly limited by the 50-square foot principle affecting each of the camps then used for human occupancy:

```
Capacity as of January 1, 1977          2,214

Plus:  New Camp 25          192
       New Camp 26          192       + 384

Less:  Camp 5              127
       Camp 6              120
       Camp 8              134        - 381

Total allowable capacity 4-1-77       2,217

Less: Camp 9                           - 76

Total allowable capacity 7-1-77       2,141
```

A constituent part of this court's August 7, 1975 order provides that effective January 1, 1977 "defendants shall thereafter be prohibited from accepting prisoners for whom the penitentiary is unable to provide minimum housing space in constitutionally adequate facilities," the inevitable effect of which would impose an embargo on all new commitments (excluding only revocations of parolees or work releasees) which could be housed in accordance with the court-mandated formula. At the time of the entry of that order, there was no state statute which obligated the corrections officials to accept all incoming commitments for incarceration pursuant to sentences imposed by state judges. From and after July 1, 1976, paragraph (a), Section 12 of Mississippi Corrections Act of 1976, however, makes it the *duty* of the Department of Corrections "to accept adult offenders committed to it by the courts of this state for incarceration, care, custody, treatment and rehabilitation." Thus, the defendant corrections officials, if other depopulation measures fail, cannot comply with the terms of this court's order prohibiting them from accepting prisoners for whom the penitentiary is unable to provide minimum housing space, and at the same time fulfill their statutory obligation to accept *all adult offenders committed to their custody.* Such a result clearly raises the question of the unconstitutionality of Section 12 insofar as it conflicts with the court's injunctive order.

Other potential impediments to meeting the court's January 1, 1977 depopulation order and thereafter adhering to it are the provisions of state law prohibiting the release of an inmate on work release to a county in Mississippi over the written objection of the sheriff, senior circuit judge or district attorney,[13] and the provisions of state law precluding the corrections officials from placing any offenders in county jails throughout the State except upon first

---

**13.** Section 77, Mississippi Corrections Act. Section 47–5–165 Miss.Code of 1972, is amended as follows:

*47–5–165.* Notwithstanding any provisions of sections 47–5–159 to 47–5–169 to the contrary, no offender of the custody of the department released under the provisions of said sections may be sent to any county in Mississippi until the sheriff of the county and the senior circuit judge serving the county have been notified not less than thirty (30) days prior to the release of the offender for work release. In the event the sheriff, senior circuit judge or district attorney object, in writing, within a period of thirty (30) days, the offender shall not be released to such county.

obtaining consent of the local jail authorities.[14]

■ Where a situation arises regarding the injunction against enforcing a statute or statutes of statewide effect on the ground of federal unconstitutionality, we become directly confronted with the question of whether the issue is one for resolution by a three-judge court convened pursuant to 28 U.S.C. §§ 2281 and 2284. It is immaterial that the issue of constitutionality of a state statute is put in question because of conflict with the effects of a federal court's injunctive order rather than from the statute's terms. "A statute does not have to be directly challenged as unconstitutional on its face where the impact of a court order achieves the precise result requiring a three-judge court." *Costello v. Wainwright,* 539 F.2d 547, 552 (5 Cir. 1976). On August 12, 1976, Public Law 94–381, 94th Congress, S. 537 repealed § 2281 and amended § 2284 to eliminate the requirement of a three-judge court in actions seeking injunctive relief against enforcement of state statutes on ground of the unconstitutionality, with certain exceptions not applicable here. However, by § 7 it was expressly provided "this act shall not apply to any action commenced on or before the date of enactment." [15] Since the present action was filed long before the three-judge court amendment, and the issues of unconstitu-

tionality of housing conditions and inmate protection have been in litigation since 1971, § 2281 undeniably requires the convening of a three-judge court to grant permanent injunctive relief striking down statutory provisions which prohibit corrections officials from carrying out the duties imposed upon them by the United States Constitution.

Accordingly, we request the convening of a three-judge court consistent with *Costello's* holdings and the procedure therein approved.

Section 2281 does not, however, render this court powerless to enjoin enforcement of sections 12, 74 and 77 of the Mississippi Corrections Act, for § 2284(3) expressly empowers the district judge, to whom application for injunctive relief is made, to issue a temporary restraining order against enforcement of state statutes on the ground of asserted unconstitutionality to prevent irreparable injury and damage, with such temporary restraining order to remain in force until hearing and determination by the full three-judge court. We have no hesitation whatsoever, on the basis of findings of fact of conditions at the Mississippi State Penitentiary which are constitutionally impermissible, that this is a proper case for the issuance of an appropriate temporary restraining order.

Let an order be issued accordingly.

---

14. Section 74, Mississippi Corrections Act. Section 47–5–159 Miss.Code of 1972, is amended as follows:

*47–5–159.* Any person convicted of an offense against the State of Mississippi and committed to the custody of the department shall be under the jurisdiction of the department. The commissioner shall adopt rules and regulations governing the confinement of an offender outside the confines of any facility of the department, as authorized by sections 47–5–159 through 47–5–169, including, but not limited to, places of confinement, security of such places, facilities, transportation of offender to work assignments and duties of local security personnel. The commissioner may designate as a place of confinement any available, suitable and appropriate institution or facility, including a county jail or offender camp, whether maintained by the commissioner or otherwise; *provided however, that if the facility is not maintained by the department, the consent of the*

*governing authorities of the facility must first be obtained,* and the commissioner shall make full reimbursement to the local confining jail or facility for all costs incurred in the confinement of said offender or offenders. The commissioner with the approval of the board, from gifts and grants, may pay for rental of facilities to house offenders, for the renovation of such facilities and for the transportation of inmates to and from work. The commissioner shall, whenever practical, confine offenders participating in a work release program in a community based facility. (Emphasis added).

15. The legislative history of the amendment makes it clear that "cases filed prior to the enactment of this bill shall proceed to final disposition under the law existing on the date they were commenced." S.Rep.No.94–204, U.S.Code Cong. & Admin.News, 94th Cong., 2d Sess., p. 3173 (1976).