Kelly CHAPMAN, # 122531, Lucasville, Ohio, and Richard Jaworski, # 140–021, Lucasville, Ohio, Plaintiffs,

v.

James A. RHODES, Governor, George F. Denton, Director of Rehabilitation and Corrections, and A. R. Jago, Warden, SOCF, Lucasville, Defendants.

No. C–1–75–251.

United States District Court,
S. D. Ohio, W. D.

June 29, 1977.

---

Christopher D. Stanley, Cleveland, Ohio, Robert P. App, American Civil Liberties Union of Ohio, R. Raymond Twohig, Jr., Louis A. Jacobs, Ohio State U. College of Law, Howard J. Rosenberg, Bruce Friedman, Jan C. Leventer, and Edward Clark Barrows, Columbus, Ohio, for plaintiffs.

Allen P. Adler, Leo J. Conway, Asst. Attys. Gen., Columbus, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOGAN, Chief Judge.

### Introductory

The basic question in this case is whether or not the prisoners at the Southern Ohio Correctional Facility for Ohio state prisoners at Lucasville, Ohio, are presently being subjected to "cruel and unusual punishment" or are being "deprived of life or liberty without due process of law" by reason of the "double celling"—and its concomitants—which is now and has been for some time in effect at that institution.

The claim was made in this case, filed under 42 U.S.C. § 1983, by two inmates who had then recently been double celled. The federal rights claimed denied are those assured under the eighth and fourteenth amendments and this Court has basic jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). The action was first filed as a purported class action by the two inmates *pro se* and *in forma pauperis.* Certification as a class action was originally denied on the ground that the asserted representatives were not qualified to represent the claimed class. Thereafter, competent counsel entered appearances on behalf of the plaintiffs and thereupon the case was certified as a class action.

The plaintiffs have proceeded from the start of this case through the evidentiary hearing *in forma pauperis.* Shortly before the trial a request was made for approximately 35 writs of habeas corpus ad testificandum and, in addition, plaintiffs moved for two writs of habeas corpus ad

prosequendum. Seven of the writs were granted. The applications for the remainder were denied. It was and remains the opinion of this Court (a) that a substantial number of individuals resident of this District (including former inmates released since the practice of double celling began, former employees no longer in the employ of any of the Divisions of the State of Ohio—both of the professional and non-professional type) existed and were within the compulsion of subpoena; (b) that the plaintiffs were free to subpoena any such; and (c) because of that available pool, the availability of seven inmates for testimonial purposes was sufficient under all of the circumstances. No limitation was placed on the plaintiffs and every subpoena requested by the plaintiffs was issued without the prepayment of costs and at the eventual expense of the United States, and, in fact, a number of witnesses from the pool were subpoenaed and did testify at the trial of this case.

The five inmates who were produced at the trial pursuant to the writs of habeas corpus ad testificandum did in fact each testify. The two inmates who were present throughout the entire trial pursuant to the writs of habeas corpus ad prosequendum sat at counsel table and aided counsel throughout the trial of this case, which consumed a week. Neither of them was put on the stand, which fairly well indicates that the writs granted were sufficient. The plaintiffs' class, throughout the entire controversy in this Court, has been fully and adequately and capably represented by counsel and the class, as such, was given adequate membership representation of its own selection.

While the plaintiffs come close to it,[1] they do not claim that double celling is per se unconstitutional. The assertion is that under all the circumstances of this case the practice is per accidens unconstitutional. The circumstances asserted to cumulatively bring about that result are as follows:

a) That violence and terror, to an impermissible degree, result from such.

b) That the guard and staff level has not been increased, is inadequate to serve the present population and that the inadequacy has fostered lawlessness and violence.

c) The feeding facilities are overtaxed to the point that the prison population is not properly fed.

d) The overcrowding has unduly burdened access to the courts.

e) The heating and ventilation systems have been overtaxed to the point of rendering cell blocks intolerable.

f) Available medical services are overtaxed.

g) Job opportunities have not kept pace with the population, reducing the rehabilitation process and the same is true of the school and schooling facilities.

These findings and conclusions will be directed to those areas as the relevant ones, since the State has put at issue each of the claims.

## FINDINGS OF FACT

### I. The Facility

The Southern Ohio Correctional Facility is located near the Village of Lucasville, Ohio. The immediate area is rural. It is approximately 100 miles east of Cincinnati and approximately 10 miles north of Portsmouth, Ohio. It is Ohio's only maximum security penitentiary. It was built in the early 1970's at a cost of some $32 million. It was designed to replace the ancient Ohio Penitentiary in Columbus. It is on a huge acreage tract. The structures themselves, i.e., the facility proper, occupies more than 20 acres and is under "one" contiguous roof. Looking at it from a brick and mortar viewpoint, it is unquestionably a top-flight, first-class facility. It has been in use only a relatively few years.

One of the controversial issues in this case is the question of how many prisoners

---

1. The plaintiffs do assert that double celling in an approximately 65 sq. ft. cell for the day-by-

day times described herein is "per se" unconstitutional.

it was designed to house. "Designed to house" is a rather nebulous term in this field. Nationally, during the five or six years before Lucasville opened, the prison population in the United States had dropped some eleven plus percent. Nationally, in the four years or so since it has opened, the trend has been reversed and the prison population has gone up almost forty percent. There is no controversy with this: As built, the facility contained some 1,660 cells and, for our present purposes, each cell was designed to and did contain one bed. It was therefore the contemplation of officialdom that the facility would, during its useful life, not be called on to house more than 1,600 or 1,700 people and that would be in single cells.

The institution is probably best described as three prisons, K block, L block, and J block, which share common support facilities. K block and L block are virtually identical and each consists of a long, spine-like corridor with eight cell blocks off the corridor, a gymnasium at one end of the corridor, and access to the rest of the facility at the other end of the corridor. The cell blocks are numbered consecutively K–1 through K–8 and L–1 through L–8 and each cell block has two upper and two lower cell ranges with twenty cells to a range. Some of the cell blocks have inner cell ranges in which the outer wall of the cell block is not used as a wall of the cells in the range. The rest of the cell blocks have outer cell ranges in which the outer wall of the cell block does constitute a wall of the cells in the range. In such cell blocks, each cell has a window that can be opened or closed by the occupants of the cell. A guard's console with controls for automatically closing and opening all the cells or any combination of them is located just inside the door from the corridor to the cell block. At the end of each cell range closest to the guard console is located a shower stall.

K block and L block corridors intersect each other at a 90° angle. A third corridor near this intersection leads to J block, a smaller and more secure version of K and L blocks. J block corridor only has four cell blocks off of it (J–1 through J–4) and at the end of the corridor is a visiting room rather than a gymnasium. J block is used to house inmates on death row (who are single celled) and inmates who have been placed in long-term administrative isolation for various serious disciplinary violations (some of whom are double celled). Each of the four cell blocks has four cell ranges as described above.

Located near the intersection of J, K, and L blocks are the library and the school facilities. The library is a modern, well-lit room, stocked with some 25,000 volumes. Included is a law library.[2] Nearly every expert witness who testified in this case found the library to be superior in quality and quantity. The school facilities are located above the library and at the time of trial consisted of eight classrooms which were being remodeled to add additional classroom and office space.

A corridor from the intersection of J, K, and L blocks leads to the rest of the facilities. Along this corridor are located two chapels for holding religious services, the commissary, a barber shop, the dining rooms and kitchen and workshops. The workshops contain the prison laundry, a machine shop, a shoe factory, a sheet metal shop, print shop, sign shop, and small engine repair shop.

Finally, another corridor leads to the entrance of the institution. Located off this corridor are the administrative offices and staff dining room, a large visiting room, the medical and dental facilities, including a hospital ward with twenty single isolation cells and two ten-bed wards and the so-called merit block (D–2) where inmates who have achieved honor status are housed. The merit block has eighty cells and is presently single celled.

This complex is surrounded by two twelve-foot high, barbed wire topped, chain link fences and eight guard towers. Also, inside the fence are an outdoor recreation

---

**2.** The plaintiffs do *not* claim that the law library is objectively inadequate. It *is* quite ade-quate. The plaintiffs' claims rest on "unavailability."

field, outdoor visitation area, and tomato garden. On the outside of the fence is a patrol road and also located outside the fence is a power plant and warehouse for the institution.

Shortly before the trial of this case, the plaintiffs moved that the Judge who presided at this trial "view the premises." That motion was granted and, in the company of a law clerk and with practically no notice, the facility was toured for approximately four hours just a few days before trial. The time expended was ample, since we are no stranger to Lucasville by reason of prior inspections and one "on the spot" civil rights case hearing. One of the difficulties of a "view" in a bench trial is the extent to which the view of necessity becomes evidentiary. Under that heading—the facility is new and that, of course, is a plus; as such places go, it is not lacking in color and most such places surely are; generally speaking, it is quite light and quite airy, etc.

## II. The Inmates

At the time of trial, SOCF contained some 2,300 inmates. Sixty-seven percent of the inmates were serving either life or first degree felony sentences.

SOCF began receiving inmates in late 1972. Many of the inmates were transferred to SOCF from the Ohio Penitentiary. The closing of the Ohio Penitentiary[3] and the transfer of its inmates to SOCF did not take place overnight. The inmate population figures for SOCF have, therefore, exhibited an increase from the very first year of its operation. In more recent years, however, the number of commitments by Ohio courts has greatly increased and the inmate population figures at SOCF (as do those of the entire Ohio system) reflect that increase. Sometime in 1975, the administration began double celling inmates at SOCF. The inmate population figures since 1975 are as follows:

| | |
|---|---|
| January, 1975 | 1,320 |
| January, 1976 | 1,954 |
| January, 1977 | 2,202 |
| Trial Date (May 23, 1977) | 2,313 |

**3.** The Ohio Penitentiary continues to operate today as the Correctional Medical and Recep-

## III. The Cells

Counting the medical ward, merit block and J, K, and L blocks, SOCF has 1,660 cells. The medical ward (D–1) accounts for forty of these cells with two, ten-bed dormitories and twenty outside cells.

The remaining 1,620 cells are either inside or outside cells. There are 660 inside cells and they are located as follows:

| | |
|---|---|
| Merit Block (D–2) | 80 |
| J–1 through J–4 | 260 |
| K–1 through K–4 | 320 |

Inside cells measure 6' × 10'6" × 9' high, are windowless, and consist of three solid walls with the fourth wall barred and serving as an entrance.

At the time of trial, all the cells in K–2 and K–3, most of the cells in K–4, and some of the cells in J–4 were doubled.

Cell blocks D–2 (merit)—80, K–1 (protective custody-max)—80, J–1 (Super max)—65, J–2 (disciplinary isolation)—65, and J–3 (death row)—60 are single celled. There are, therefore, about 350 cells in "undoubled" blocks.

There are 960 outside cells and they are located in K–5 through K–8 and L–1 through L–8. Outside cells measure 6'6" × 10'6" × 9' high and are otherwise similar to inside cells, except that they each have a window which can be opened or closed by the occupants. Nearly all of these cells are doubled.

All cells, with the exception of those in the medical ward, contain the following furniture and equipment: one cabinet-type night stand, one wall cabinet, one wall shelf, one wall mounted lavatory with hot and cold running water and steel mirror, one china commode which is flushed from inside the cell, one wall mounted, built-in radio, one heating and air circulation vent located near the ceiling, one twenty-six inch lighting fixture and one bed, 36 inches by 80 inches. In those cells which are doubled,

tion Center (CMRC), a central medical facility for all Ohio prisons.

a second bed has been added, bunk style, to the wall above the original.

There are at least three methods of "rooming" prisoners that have been referred to in the testimony in this case. One is the dormitory method, involving a number of beds, etc., in one large room. At the other end of the pendulum is one prisoner per cell of adequate size. The third method is doubling up in the cells. The dormitory method is the most objectionable. The preferable or ideal is one prisoner per cell.

Each cell block at the facility contains as a "built-in" adjunct a day room. By "built in" we mean the placement is such that one may go from any of the ranges to the day room without leaving the block; or stated otherwise, passage from a cell to the day room does not involve opening the block door, nor does it involve walking into the corridor. The day rooms are in a sense part of the cells and they are designed to furnish that type of recreation or occupation which an ordinary citizen would seek in his living room or den. Day rooms provide a place where a prisoner may go to get out of the confines of his cell and interact with different people, etc. These day rooms vary in size. Each day room contains a wall mounted television, four or five card tables, and a varying number of chairs ranging from thirty to sixty. Inmates who are celled in K–5 through K–8 and L–1 through L–8, who are not at meals, recreation, the library, jobs, school, the visitors rooms, or showers, and, except between the hours of 9:30 p. m. and 6:30 a. m., may divide their time between their cells and these day rooms. During the daytime hours there is a ten minute day room break every hour on the hour in which the day room and the cells in the block are unlocked and inmates may return to their cells from the day room or vice versa during that period.

The plaintiffs have claimed in this case that the double celling and the increase in population has rendered the day rooms functionally useless. The assertion rests on a number of subsidiary assertions, such as, in the same breath, that now they are used by 80 to 120 people at a time, whereas, they used to be occupied by about 40 at a time, and "some inmates do not use the day rooms due to the overcrowding." At the worst, the day room availability has decreased 50%, but even that is speculative. The most this Court could find as a fact based on the evidence in the case is that there are infrequent occasions during which the day rooms are not as available as they would be if single celling were the 100% rule. That reduction is not significant in any respect.

## IV. Inmate Classification

An inmate's classification determines where he will be housed at SOCF. The regulations governing the initial classification and reclassification of inmates were admitted as exhibits in this case and have been reviewed by this Court. According to the regulations, a Reception Center Classification Committee (and later an Institution Classification Committee) attempts to determine the needs and requirements of an inmate by considering such information as staff reports, presentence investigations and educational and vocational testing reports and then assigns the inmate to appropriate custody, work or training programs.

Upon arrival at SOCF, all new inmates are housed in K–5, which is also known as the Receiving Block, pending classification by the Institution Classification Committee. This process usually takes a couple of weeks. Inmates from K–5 do not eat in the dining room at the same time as other inmates and generally do not mingle with general inmate population.

After being classified, an inmate is assigned to another cell block. Cell blocks K–6 through K–8 are presently used to house inmates who have trade or vocational assignments. Cell blocks L–1 through L–8 house, for the most part, inmates who are attending school or have jobs. Cell block K–3, and part of K–4, house inmates who choose to be "voluntarily idle." Cell block K–2 is designated "limited activity" and houses those inmates who have requested protective custody, but other than that request have not substantiated a need for

protective custody. Cell block K–1 houses inmates in full protective custody. Cell blocks J–1, 2, and 4 house inmates in administrative isolation for disciplinary reasons. Cell block J–3 and a few cells in J–2 constitute death row. Cell block D–2 is the merit block where inmates who have attained honor status are housed.

As a direct result of this classification system, the cell block in which an inmate is celled establishes, in large part, the amount of time in which an inmate must be locked in his cell with a cellmate. For example, inmates celled in cell blocks K–6 through K–8 and L–1 through L–8 have to be locked in their cell with their cellmate only from around 9 p. m. to 6:30 a. m. During the rest of the day, these inmates could be eating meals in the dining room, at recreation (three times per week), at the library (four times per week), at their particular job or school, in the visitors room, the shower, or in the day room.

Inmates celling in K–3, K–4, and K–5 because of their idle or receiving classification do not have as much opportunity to be out of their cells as those inmates in K–6 through K–8 and L–1 through L–8.

Furthermore, all the inmates in K–3 and K–4, as well as K–6 through K–8 and L–1 through L–8, are permitted one weekly visit to the commissary, can attend the weekly movie shown in the gymnasium, and can attend religious services in the chapel.

Inmates celled in protective custody (K–1) and limited activity (K–2) have recreation in their respective day room and are permitted to shower. With those exceptions or unless escorted by a guard (such as to the visitors room), inmates in K–1 and K–2 spend all their time locked in their cells. As noted, K–1 is single celled and no one is placed in K–1 or K–2 who does not request it.

Similarly, inmates housed in the four J blocks spend nearly all their time locked in their cells.

At the risk of complicating, but in an effort to simplify—since permissible "out of cell time" is of such import in a double celling case—the evidence in this case establishes (out of 1,620 cells—the 40 hospital cells being excluded):

I. A total of 340 are single celled, including D–2, 80; K–1, 80; J–1, 20; J–2, 80 and J–3, 80. Leaving a total remaining involved of 1,280 cells.

II. The occupants of 960 of those cells, K–6, 80; K–7, 80; K–8, 80; L–1, 80; L–2, 80; K–3, 80; L–4, 80; L–5, 80; L–6, 80; L–7, 80; L–8, 80; D–2, 80; are on school, or work, or merit status and are out of their cells (or at least have that option) some ten hours a day.

III. The occupants of the remainder (320 cells) are "out of cells" variably as follows:

| | | |
|---|---|---|
| K–2 Limited Activity (semi-protective) | 6 hrs. | weekly |
| K–3 Idle | 4 hrs. | weekly |
| K–4 Administrative Isolation | 2 hrs. | weekly |
| K–5 Receiving | 4 hrs. | weekly |

(K–5 are also "out of cells" for meals and the "tour" in K–5 is a brief one, about 2 weeks.)

Inmates in K–2 and K–3 are there by "choice" (at least to some degree). Inmates in K–4 are there as a result of claimed rule infractions and following a plenary hearing.

## V. Inmate Lifestyle

As the aforementioned indicates, about 75% of the inmates of SOCF who are double celled have the choice of spending a considerable amount of their time outside of their cells. We turn now to examine the effect that double celling has on other aspects of the inmates' lifestyle.

### —Food—

The plaintiffs have claimed that double celling has overcrowded SOCF and resulted in the inmates' present quantity and quality of being "grossly inadequate." To prove this allegation the plaintiffs presented three lines of evidence: Some inmate testimony that food portions have decreased since double celling began, a New York prison expert who testified that the lowest

amount he ever knew spent for food for inmates in New York was $1.70 each per day, and the food budget figures for SOCF for 1975, 1976 and the first part of 1977 (pex. 26). These figures show that $680,-718.00 was expended for food in 1975, $1,140,429.00 in 1976, but only $233,370.00 for the first calendar quarter of 1977.

The defendants presented testimony that the food was more than adequate in quantity and quality and that much attention was paid to making certain that it was served hot. The testimony established that the discrepancy in the budget figures was due to a new "portion control" program instituted in all Ohio prisons. Furthermore, the defendants pointed out that not reflected in the budget figures was food supplied by other Ohio prisons, such as milk from the London Correctional Institution's dairy farm.

None of the inmates who testified or appeared during the trial of this case appeared in any way undernourished or malnourished. The guards, as well as the administrative personnel, eat certain of their meals at the prison in a small cafeteria. The prepared food in that cafeteria comes from the same kitchen which serves the prisoners' dining rooms. Generally speaking, what will be served to the inmates as an evening meal is served to the guards and administrative personnel as a noon meal. No inordinate amount of food is garbaged. The portions are adequate. The kitchens and the dining rooms are clean. There is evidence that in one month, April of 1976, some 174 mice were caught in the area of the kitchen and dining rooms. That is an isolated instance and, under the evidence in this case, does not establish that the condition was present with any degree of permanence. The evidence is more consistent with a temporary rodent problem.

We do not mean to imply that the meals are the equivalent of home-cooked ones in any sense, but, on the other hand, we certainly find them to be adequate in every respect and there is no indication whatsoever that prisoners have been underfed or that the food facilities have been taxed by the prison population.

—Air—

The plaintiffs have also claimed that double celling has made the cell blocks "humid and stuffy with stale air" and noise levels "intolerable." Every cell has a heating and air circulation vent and many have windows. The plaintiffs' own expert testified that he noticed no odors and that the cell blocks were "too quiet." (While the outside temperature exceeded 90° during this Court's inspection, the temperature inside the corridors and cells remained quite comfortable. No excessive noise was noted.) It is found that the institution is not unusually stuffy or humid. The ventilation system is adequate. Offensive odors are not present to any significant degree.

—Visitation—

SOCF is one of the few maximum security prisons in the entire country which permits contact visitation for all inmates. The plaintiffs' claim that the visitation facilities have been "overwhelmed" because of double celling was not proven at trial, i. e., no evidence was produced to substantiate it.

—Lawless Atmosphere—

Another of the inmates' claims was that double celling has resulted in overcrowding that has produced a "lawless atmosphere" at SOCF that the guards can not control. The statistics produced to establish an increase in violence have been almost worthless to this Court because of several differences in record keeping. This Court does find that the plaintiffs have established that violent incidents have increased as the inmate population has increased. The plaintiffs have not established that violent incidents have increased out of proportion to the increase in inmate population.

The testimony concerning the amount of guards needed at SOCF was quite conflicting. Two guards testified for the plaintiffs that more guards were needed. One of defendants' experts testified that SOCF had too many guards.

This Court accepts the testimony of plaintiffs' expert from New York, Adam McGuillan, that a good "acceptable" inmate to guard ratio is seven to one. The inmate to guard ratio at SOCF is presently 6.13 to one, well within the acceptable ratio.

—Plumbing, Lighting, Law Library—

No evidence was presented which would demonstrate that the plumbing, lighting, or law library facilities are inadequate to meet the needs of the increased population.

As has been noted before, the plaintiffs' complaint with respect to the law library is not that it is inadequately equipped or booked. The claim is that access is denied. There was no evidence produced at all with respect to denial of access to the general population. The claim really boils down to access being denied to inmates in protective or disciplinary status. However, as applied to such inmates, law books are brought to the blocks involved on the request of inmates. There is no evidence at all that any of such requests were unreasonably denied. That entire situation would obviously exist whether the cells were double occupied or single occupied.

—Rehabilitation—Jobs—

The plaintiffs further claim that overcrowding due to double celling has reduced an inmate's opportunity to rehabilitate himself by lessening his chances of receiving educational or vocational training or a meaningful job. The statistics provided to this Court in plaintiffs' exhibits 24 and 25 are as follows:

|  | Inmates Working | Inmates School Full Time | Inmates Idle |
|---|---|---|---|
| January, 1975 | 698 | 197 | 201 |
| January, 1976 | 855 | 345 | 464 |
| January, 1977 | 1,154 | 430 | 281 |
| May 2, 1977 | 1,150 | 426 | 360 |

These figures do not include inmates in administrative isolation, death row, protective custody, merit status, or absent with leave (a total of 355 inmates as of May 2, 1977).

The plaintiffs argue that the increase in the number of inmates listed as working is not due to an increase in the amount of jobs as much as it is due to a "watering down" of the jobs that exist by assigning more inmates to each job than are necessary to complete the job. Thus, one inmate testified that he only actually worked twenty minutes per day to complete his job. Other inmates, such as food service workers, work closer to five or six hours each day. In any event, this Court finds that the testimony that there are not enough jobs to go around is credible,[4] as is the testimony to the effect that many inmates assigned to jobs work only an hour or so a day.

—Schools—

There is no complaint about the classrooms or the equipment or library facilities insofar as schools are concerned. The classrooms are light, airy, and well equipped. Nor is there any complaint that access to schooling has been denied. About one out of six inmates opts to go to school and that was the percentage at the time of single celling, and still is. Classroom attendance involves approximately 10 hours a week and inmates in school have access to the library. There is no evidence that any inmate ready, able, and willing to receive schooling has been denied the opportunity. There is evidence and it is found that the opportunity has been substantially delayed since double celling. Double celling has obviously interfered with studying since studying is left for the cells and day room.

—Medical, Dental and Psychological—

At least one registered nurse and several nurses are on duty full time. A prisoner seeking medical assistance obtains a sick

---

4. Inmates who work receive twenty dollars a month. Of this twenty dollars, eight dollars is placed in a fund to be given to the inmate upon his release from incarceration. The remaining twelve dollars may be used by the inmate at the commissary. Inmates who do not work and are indigent receive personal hygiene items (razors, soap, toothbrushes, etc.) at the expense of the state. Indigent inmates also receive free postage and paper for one letter per week as well as free postage for all court related mail.

call pass from the nurses. Sick call is held every day for the general population. It is held only once a week in the so-called "uptight" blocks (isolation, disciplinary, idle, protective custody). That means that except for emergency situations, a prisoner in an uptight block has an opportunity only once a week to see a nurse who comes around to that block. The decision whether an inmate will be seen by a doctor is made by a nurse and following the request of a guard, and that is true both in the uptight and general population blocks. The facility has an arrangement with one physician who is a qualified one and has considerable education, training and experience in both the general practitioner and surgical field. Sick calls are held by him at the facility at regular intervals at least twice a week, and the same doctor who lives and offices near the institution is available for emergencies at all times. There is a hospital close by at Portsmouth, Ohio, which has been used for emergency purposes and many serious cases are referred to the Correctional Medical and Reception Center at the old Ohio Penitentiary at Columbus, Ohio. There is no credible evidence in this case based on which one could conclude that the authorities were indifferent to the medical needs of the inmates. Each week the doctor does see a substantial number of prospective patients and also those receiving ongoing treatment, and he does issue such prescriptions and orders and directions as he considers medically necessary. Those prescriptions are daily provided for from an adequate pharmacy. There is no substantial evidence that the directions are not followed as a general rule.

There is evidence in the case of a denial of what inmates consider to be appropriate medical treatment and there is evidence of isolated instances of failure to provide medical attention on request of a guard. The Medical staff has not been increased since the days of single celling. The situation does, of course, leave much to be desired, but cannot be described as out of hand or the result of indifference.

With respect to dental—there was a full-time dentist in the employ of the institution from April of 1976 to April of 1977. The dentist who occupied that position left and since has been replaced. Both at the time he came on and within a month after he left, a substantial waiting list and backlog of dental needs built up. There are several dental paratechnicians recruited and trained from the dental staff. When the then new dentist came on in April of 1976, there were approximately 100 people waiting to see him and in mid-May of this year, the backlog before the arrival of the new dentist was as follows:

> There were approximately 170 people waiting to get dentures of one kind or another;
> Approximately 140 people waiting to have teeth pulled and several hundred awaiting cleaning and cavity attention.

These temporary situations are, of course, intolerable. On the other hand, the evidence indicates that one dentist with the para-assistant is able ordinarily to cope with the needs of the population to the extent that those needs could be described as pressing. That is not to say that a single dentist can do anything but deal with immediate problems. He cannot. For instance, there is no time at all to formulate treatment plans for patients and carry them out. Again, there is no evidence that the authorities are indifferent to the needs.

Included in the staff at the facility are a psychologist and a social worker. The staff has not been increased since the double celling. The services rendered in that area have been substantially denied to a number of inmates due to the double celling.

## VI. Violence

The evidence in this case relating to double celling and violence is divided into three categories: (1) Expert, (2) Guard and inmate, and (3) State prison management and its records.

### —Expert—

The experts were all in agreement—as is everybody—that single celling is desirable. Double celling involves, of course, loss of

privacy and close contact with another person involving an increase in tensions and frustrations. That is accented (1) by the fact that the inmate has little, if anything, to say on the choice of a cellmate, and (2) by the fact that a substantial number of the inmates are victims of some form of emotional or mental disorder. One expert testified that in a maximum security prison of any size some 15% of the inmates may be expected to be schizophrenic and that that type is particularly prone to violence engendered by "close quarters" and "frustrations." The prison psychologist and chaplain both testified that double celling had led to increasing tension, both proportionate and geometric, and aggressive and anti-social characteristics.

—Guards and Inmates—

Introductorily, the credibility of the inmates and the two guards who testified for the plaintiffs is unusually difficult of assessment. The plaintiffs' main factual witnesses consisted of the five inmates and one guard, Johnson. According to Johnson, the conditions with respect to double celling are intolerable. He testified that two men cannot move at the same time in a double cell (that is not so); that in one month he had four stabbings, two fights and a rape in a day room since double celling and none before; that nearly all the prisoners carry weapons to protect themselves; that in his cell block there were two fights a week between cellmates and two rapes a month vs. scarcely any stabbings or rapes before and a lot less fights; that extortions and body sales were rampant now generally and scarcely occurred at all during single celling; that most of the violence occurred between cellmates; that one guard in a "general population" block could maintain order if the block were single celled but that with double celling it is "impossible" to do so; that a guard can establish "rapport" in a single celled block but not in a double celled one; that the day rooms are now overcrowded and it is impossible to maintain order, etc. Johnson came under the heading of "protesting too much." He has been suspended several times and at the

time of trial was the subject of some disciplinary proceeding. He failed to report most, if not all, of the incidents of violence he testified to—giving as the reason they were not to be reported until verified or confirmed with the names of the participants and citing the difficulties in getting one inmate to name another. Based largely on his demeanor on the stand this Court does not regard Johnson as a credible witness.

The difficulty in assessing the credibility of the inmates' testimony is pointed up by this Footnote 3 to the plaintiffs' request for findings:

3/ The refusal of inmates to "snitch" on the witness stand and name victims and predators they observed is understandable. "Snitching" is the act of reporting criminal behaviour to the administration. The testimony shows that if it becomes known that an "inmate snitched" his life was not worth a plug nickel * * *

Thus, while the inmates testified at length to violence, increase in violence, extortions, rapes and body sales and to the necessity of a substantial number of new inmates seeking protective custody or placing themselves under the protection of a "man"—all, when asked on cross-exam, declined to name names, etc. For reasons best known to themselves, the defendants did not seek a Court order to answer. The point is that the inmate testimony was conclusory and general and not of much help from a credibility point of view.

We have no doubt that to a certain degree the criminal activity described by the prisoners does exist to a certain extent at Lucasville and, for that matter, in all prisons. The mere classification of a prison as "high security" implies that the overwhelming percentage of its inmates are there because of the commission of crimes involving violence directly (such as homicides) or courting it (such as burglary or larceny) and the fact of the matter is, as the recidivism rates show, that the inmate is likely to repeat. The problem posed by this case is simply whether double celling, as such, accounts for it.

—Prison Management and Its Records—

It has now been about two years since double celling has been in practice, to some and an ever-increasing extent, at Lucasville. The prison physician, who has been there throughout most of that time and would be called on to administer to any inmate seriously affected by violence, testified that there has been no increase other than what one would expect from increased numbers. He was joined in that testimony by the Superintendent and other prison authority. More importantly, the Regulations of the Department of Corrections of Ohio require the written reporting of any acts of violence. Such reports have been made and are in evidence as plaintiffs' exhibits 28, 29 and 30. These records are in detail and bespeak credibility.

On a percentage of incident rate (obtained by dividing the population number into the number of incidents) and on a quarterly basis, there is no substantial difference between occurrences during single celling and double celling. Thus, the "Stabbings" during the first and second quarters of 1975 (single celling) were respectively .22% and .40%; during the last quarter of 1976 and the first quarter of 1977 (double celling) the figures were .33 and .27. For "Fights" the comparable figures were 1.05 and .47 vs. .66 and .87. For "alleged—self inflicted" the comparable figures were .22 and .0 vs. .28 and .04.

We accept these figures and conclusorily find that there has been no increase in violence or criminal activity increase due to double celling; there has been due to increased population.

## CONCLUSIONS OF LAW

1. "Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison officials are responsible for maintaining internal order and discipline . . . and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

"But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison . . . practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. 396, at 404, 405, 94 S.Ct. 1800, at 1807, 40 L.Ed.2d 224 (1973).

2. The "cruel and unusual punishment" clause of the Eighth Amendment is "progressive and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by humane justice." *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 553, 54 L.Ed. 793 (1910).

3. Confinement itself within a given institution may amount to a cruel and unusual punishment where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of a reasonably civilized people. *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971).

4. Under the Fourteenth Amendment, "a prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." *Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944).

5. The courts have a duty to protect prisoners from unlawful and onerous treatment of a nature that, by itself, adds punitive measure to those legally meted out by the court. (From *Sands v. Wainwright,* 357 F.Supp. 1062 (M.D.Fla.1973), vacated on other grounds 491 F.2d 417 (5th Cir. 1974).)

6. The foregoing principles are well and authoritatively established and in line with them various federal courts, in the last seven or eight years, have critically examined the custodial institutions of many states and cities in an effort to ascertain and, if necessary, protect inmates from unconstitutional treatment while incarcerated. The question is constantly stated as one of ascertaining the "totality of the circumstances" of the particular case and then inquiring into whether the totality as determined is intolerant or shocking to the conscience, or barbaric or totally unreasonable in the light of the ever changing modern conscience. Since the "totality" of the circumstances differ from case to case, it is difficult to find "controlling" authority.

7. For example, one of the first circumstances involved in the inquiry is whether the inmates involved are convicts or detainees. The Second Circuit, in a double celling case, *Brooklyn v. Malcolm,* 520 F.2d 392 (1975) emphasized at the outset that—

> Here we are concerned only with the confinement of pretrial detainees and not convicted inmates.

*Malcolm* was a "due process" rather than "Eighth Amendment" case. However, there does not seem to be any difference between the two in the sense that the limitations imposed by both seem, under the decisions, fairly much the same.

8. Many prior prison condition cases involving double celling or overcrowding did not involve maximum security convicted felons but rather county or city jails housing pretrial detainees or misdemeanants. *Brooklyn v. Malcolm, supra; Ambrose v. Malcolm,* 414 F.Supp. 485 (S.D.N.Y.1976); *Rhem v. Malcolm,* 377 F.Supp. 995 (S.D.N.Y.), *aff'd,* 507 F.2d 333 (2d Cir. 1974); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973), *aff'd,* 518 F.2d 1241 (1st Cir. 1975); *Jones v. Wittenberg,* 323 F.Supp. 93 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972). *See also, Rodriguez v. Jimenez,* 409 F.Supp. 582 (D.P.R.), *aff'd,* 537 F.2d 1 (1st Cir. 1976). Other cases involved jail structures which were antiquated and in which the plumbing, lighting, heating, ventilation, sanitation, and noise levels bear no resemblance to SOCF at all. *Rodriguez v. Jimenez, supra,* (jail built in 1808); *Inmates of Suffolk County Jail v. Eisenstadt, supra,* (jail built in 1848); *Jones v. Wittenberg, supra,* (jail built in 1895); *Hamilton v. Schiro,* 338 F.Supp. 1016 (E.D.La.1970) and *Hamilton v. Landrieu,* 351 F.Supp. 549 (E.D.La.1972) (prison built in 1929). *See also, Pugh v. Locke,* 406 F.Supp. 318 (M.D. Ala.1976); *Holt v. Sarver, supra.* Still other cases involved dormitory or barracks housing for inmates. *Gates v. Collier,* 423 F.Supp. 732 (N.D.Miss.1976); *Holt v. Sarver, supra.* The failure to provide basic medical treatment to inmates is a condition found in other cases which is not present in this case. *Rodriguez v. Jimenez, supra; Pugh v. Locke, supra; Costello v. Wainwright,* 397 F.Supp. 20 (M.D.Fla.1975), *aff'd,* 525 F.2d 1239 (5th Cir. 1976); *Jones v. Wittenberg, supra,* and 73 F.R.D. 82 (N.D. Ohio 1976); *Hamilton v. Schiro, supra.*

9. On the question of inmate violence, Courts have recognized that probably no prison is a "safe" place to live[5] and that incidents of violence, including homosexual attacks, are going to occur in the best run prisons. *See, e. g., Finney v. Hutto,* 410 F.Supp. 251 at 263 (E.D.Ark.1976). It is simply impossible to stamp out crime and

---

**5.** One witness testified that in the same period of time during which two inmates were killed at SOCF, 164 inmates and 16 staff members were killed at another state's maximum security prison of comparable size to SOCF.

violence in a place where one is the most apt to expect it—maximum security prison. For one reason the authorities are simply unable in most instances to ascertain the identity of the aggressors. This fact of life does not, of course, excuse prison officials from using ordinary care for the safety of inmates from violence from other inmates. The defendants have not failed to use ordinary care for inmate safety. A sufficient number of guards has been provided. Homosexuality, enforced and consensual, extortion and criminal activity have increased with double celling, but only proportionately and not geometrically.

■ 10. With respect to inmate privacy, this Court is aware of no authority holding that convicted maximum security inmates have a constitutional right to privacy or private living quarters—nor have we been cited to any.

■ 11. Medical and Dental. The Supreme Court has recently reaffirmed: "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration . . . 'it is but just that the public be required to care for the prisoner, who cannot, by reason of a deprivation of liberty, care for himself.'" *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). The state may not be indifferent to but must provide basic care. And that, of course, is true of dental care. The record does establish that the inmates' State has provided an adequate medical staff consisting of a physician and several nurses; that the doctor holds at least semi-weekly sick calls; that he is subject to and does respond to emergency calls; that patients have been treated, hospitalized at the location, and on occasion as required taken to local or Columbus hospitals. The constitutional requirements of basic medical care and *concern for the inmates* have been met.

That cannot be said of the dental care situation. There have been two occasions during which the defendants have failed to provide adequate dental care and each of them has occurred when the state-provided dentist resigned and there existed a vacancy pending obtaining a successor. At the present time a competent dentist is adequately serving the facility and whatever relevancy the previous deficiency had to "double celling" has passed.

■ 12. It is our conclusion overly and on balance that the double celling at Lucasville is unconstitutional. The conclusion is based on these reasons.

—A—

The inmates are "long term." That can only accent the problems of close confinement and overcrowding.

—B—

The rated capacity of the installation is 1,600. It was designed to hold that number. Overly, it is now holding some 38% more people than the designers and builders intended it to. One method the Courts have used rather consistently to gauge overcrowding has been to compare the actual population with the rated capacity. Overcrowding necessarily involves excess limitation of general movement as well as physical and mental injury from long exposure. Remedial decrees have issued limiting to "design capacity." *See Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla.1975); *Ambrose v. Malcolm,* 414 F.Supp. 485 (S.D.N.Y. 1976). In the latter case, the Court said:

" . . . it is manifest that the defendants may not house detainees in the dormitories of (the prison) in numbers significantly in excess of its rated capacity. Certainly this is true where, as here, the defendants have presented no evidence as to why the capacity set by the defendants themselves—or their predecessors—should not control, subject only to such variation as the record in this case may justify." (at 494)

"Rated capacity" or "design capacity" was directed by remedial decree in *Taylor v. Sterrett,* 344 F.Supp. 411 (N.D.Tex.1972). See also, to the same general effect: *Hamilton v. Schiro,* 338 F.Supp. 1016 (E.D.La. 1970); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976).

—C—

The cells were designed, built and rated to house one man. The square footage in each is, for our purposes, approximately 63 square feet—meaning that double celling reduces the square footage of living quarters per man to something in the neighborhood of 30–35 feet at best.

One court has said flatly, " . . . 50 square feet of living space is the minimal acceptable requirement to comport with the Constitution." *Gates v. Collier,* 423 F.Supp. 732, 743 (N.D.Miss.1976). That conclusion is supported by the testimony in this case and otherwise.

The American Correctional Institution has concluded that 75 square feet is the minimally acceptable standard.

The National Sheriffs Assn. Handbook on Jail Architecture (1975) asserts that single occupancy detention rooms should average 70–80 square feet (at pg. 62).

The National Sheriffs Assn. Manual on Jail Administration (1970) suggests that in multiple celling 55 square feet of space per occupant is minimal.

The National Council on Crime and Delinquency Model Act for the Protection of Rights of Prisoners (1972) concludes that "not less than fifty square feet of floor space in any confined sleeping area" should be provided as the minimal.

The Report of the Special Civilian Committee for the study of the United States Army Confinement System (1970) indicates that the Army standard in 1969 was 55 square feet and the Army, not known for "coddling," adheres to that.

All of the above conclusions deal with "sleeping space" and contemplate additional space for other purposes, such as day rooms. All are relatively contemporary. All indicate the "contemporary" standard. *Weems. See also, Pugh v. Locke, supra,* requiring single occupancy isolation cells of 60 square feet; *Martinez v. Jimenez,* 409 F.Supp. 582 (D.P.R.1976) "not less than 10 × 7."

In the *Gates v. Collier* case, *supra,* the Court observed with respect to the standard of 50 square feet of living (sleeping) space

per man, "No one takes issue with this basic requirement for human decency and this Court holds a failure to achieve that minimal standard contravenes the Eighth Amendment prohibiting cruel and unusual punishment."

—D—

At the best a prisoner who is double celled will spend most of his time in the cell with his cellmate. A substantial number must so spend all but six hours a week and another substantial number all but four hours a week.

—E—

The double celling involved here began almost two years ago and now involves some 1,400 people. In other words, this is not a situation in which the *present* need of and for single cells has just been brought about through a reversal in trends. As we have pointed out, the prison population in the United States declined steadily in the early to middle seventies and was relatively stable until 1972. Since then it has grown some 39 or 40% and 1976 was the largest single year on record. Constitutionality and unconstitutionality are relative or elastic terms and we certainly are not concluding that all double celling in any 60 square foot cell is beyond the ambit. The State need not contemplate a trend reversal. But the present trend has continued for four years—the double celling at Lucasville has done nothing but increase. It is in that background of relative permanence that the conclusions herein are reached. Double celling in 60-foot cells is undoubtedly permissible as a temporary measure, but we deal not with anything temporary here.

REMEDY

At this time and on this present record, this Court is not in any position to do aught but conclude and declare that double celling at Lucasville is federally unconstitutional.

That conclusion (if it be eventually determined to be correct) may require the State

to build additional facilities and to raise the funds necessary to do so. This Court certainly has no power to direct that on the present record and it is problematical whether a Court would ever be in a position to so do.

As the Court said in *Brooklyn v. Malcolm,* 520 F.2d 392 (2nd Cir. 1975), "we can, however, order the release of persons held under conditions which deprive them of rights guaranteed by the Constitution unless the conditions are corrected within a reasonable time."

The plaintiffs urge that the defendants should be ordered to "single cell" or "release" right now. We rather doubt that the State is, overnight, prepared to move any substantial number of inmates from Lucasville and "single cell" them elsewhere. A "single cell" or "release" order would be clear abuse of discretion on the present record. On the other hand, the State must proceed with reasonable dispatch to formulate, propose and carry out some plan which will terminate double celling at SOCF.

Within ninety (90) days from the filing hereof, the defendants may propose and file herein such a plan. A date for hearing thereon will be thereupon assigned. No order will issue at this time. Jurisdiction is retained.