Dennis TURNER, Phillip Johnson, Glenn Murray and Joe Sculley, Plaintiffs-Appellants,

v.

W. Grady STUMBO, M.D., Secretary, Department for Human Resources, Defendant-Appellee.

No. 81–5769.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 4, 1982.
Decided Feb. 21, 1983.

Jack Emory Farley, William M. Radigan (argued), Office for Public Advocacy, Frankfort, Ky., for plaintiffs-appellants.

Barbara W. Jones, Dept. of Justice, Frankfort, Ky., Paul F. Fauri, Martin Z. Kasdan, Jr. (argued) [lead counsel], Dept. for Human Resources, Frankfort, Ky., for defendant-appellee.

Before EDWARDS, Chief Judge, MERRITT, Circuit Judge, and GIBSON,* Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This is a petition filed by plaintiffs under 42 U.S.C. § 1983 (1976) complaining of deprivation of civil rights. What is involved herein is a denial of a preliminary injunction sought to prevent the closing of the Forensic Psychiatry Unit (Grauman Unit) and the transferring of plaintiffs and their class of patients to the Kentucky Correctional Psychiatric Center at the Luther Luckett Correctional Complex. It appears that after one district judge denied a temporary restraining order and another after an evidentiary hearing denied a temporary injunction, this transfer was effectuated. It is plaintiffs' earnest contention that the detention of plaintiffs is unconstitutional because the detainees are being held before trial and conviction and not in the least restrictive setting available. Plaintiffs therefore seek reactivation of Grauman and return of its previous detainees.

Plaintiffs' complaint alleged that the named plaintiffs should be given representative status as to two classes. One such class consists of persons charged with crime who are being detained to determine whether they are mentally competent to stand trial. The other consists of persons charged with crime but who have already been judged mentally incompetent to stand trial.

As to the first class, detention and evaluations are shown on this record usually to encompass a period of 30 days or less. As to the second class, detention might be much longer. As of the time of the hearing on this appeal, the transfer had been accomplished and no complaint about the operational procedures in the new location has been filed.

The District Judge who heard the motion for a preliminary injunction entered the following findings of fact, none of which appear to us to be clearly erroneous:

## FINDINGS OF FACT

Plaintiffs have brought this action on their own behalf and on behalf of others similarly situated as a class action. Plaintiffs have been indicted for serious offenses (*e.g.,* rape, sodomy, kidnapping and murder) and were committed to the Forensic Psychiatric Unit ("Grauman") at Central State Hospital near Louisville to determine their competency to stand trial and/or criminal responsibility in accordance with KRS Chapter 504. Plaintiff Sculley has already been found to be incompetent to stand trial and his prognosis for competency is not good. None of the plaintiffs is committed due to a conviction in court.

The Department of Human Resources, under the direction of the defendant, Dr. W. Grady Stumbo, is in charge of the administration of both Grauman and the Replacement Forensic Hospital facility

* Honorable Floyd R. Gibson, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

("Replacement"), which has been built and into which the plaintiffs and others will be moved around September 15, 1981. The Bureau of Corrections, under the direction of the defendant, Commissioner George W. Wilson, is in control of the outside security of the Replacement and adjoining facilities, which constitute the Luther Luckett Correctional Complex. However, that Bureau has no control of the placement of persons in the facility, as pre-trial detainees. However, when prisoners who have been convicted of felonies are under the control of the Bureau of Corrections, they may be moved to the Replacement for medical care.

The Replacement was built so as to have adequate medical facilities for both convicted persons who needed psychiatric care and for the examination of persons such as the plaintiffs who had not yet been convicted to determine competency and/or criminal responsibility. Thus, prisoners who formerly were in a psychiatric unit at the Kentucky State Penitentiary at Eddyville or in the Kentucky State Reformatory at LaGrange, where the present psychiatric facilities are not very good, will be moved to this facility. As the penitentiary at Eddyville is a maximum security institution, it was decided to build this Replacement as a maximum security facility, so that prisoners from all other institutions could be housed there for psychiatric care.

Replacement has five separate areas, consisting of three 25-man units, one 14-woman unit and one 8-bed convalescent unit.

The key distinctions between Replacement and Grauman are that Replacement has room for more residents and is more restrictive, that is, it is a maximum security institution, whereas the Grauman facility is a medium security facility. In addition, at Grauman, the residents were housed in a so-called "dormitory" facility. That means that all of the males sleep in one large room and all the females sleep in another large room, with the beds in each room apparently separated by small partitions. At Replacement, however, each person has a separate room, which can be locked. Both places have recreational facilities and day rooms, although movement in the day rooms could be more restricted at Replacement, inasmuch as the residents could be locked in their private rooms. There is disagreement among authorities in the field as to whether "dormitory" sleeping is preferable to individual rooms or cells for the residents.

It is more advantageous to treatment and diagnosis for the medical staff to have all the residents spend a lot of time together, in the day rooms or elsewhere, so that their interactions can be observed. However, the dormitory arrangements can cause problems of homosexual or other types of attacks. It would appear that a person who was housed in one of these facilities would prefer a private room or cell over being housed in one large room with others who are charged with crimes of violence, similar to those with which the plaintiffs have been charged.

The average length of stay for a pre-trial detainee at Grauman is thirty-three days and the average daily census is twenty-seven patients. However, certain detainees, such as the plaintiff Sculley, are kept longer, because they are incompetent to stand trial. In his case, he has been there for about eight months.

One reason that it is imperative that the Replacement be opened as soon as possible is that it complies with the decree in the companion case of *Kendrick v. Carroll,* Civ. Nos. 79–0092–P and 79–0001–L in this Court. The Department of Human Resources only has one staff of personnel available, and most are expected to transfer to the Replacement. If the Court were to grant the injunction sought by the plaintiffs here, it would cause a delay in the opening of the Replacement, because two staffs would have to be used, and it would severely constrain the budget of the Department of Human Resources by keeping two staffs in separate locations.

The plaintiffs seek to enjoin the defendants from closing the Grauman facility and transferring all the plaintiffs to the Replacement facility. They claim that to transfer them from a medium security institution to a maximum security institution without a determination as to a particularized need constitutes a violation of due process and equal protection of law. Therefore, they do not ask that the defendants be kept from opening the Replacement, but only prevented from closing Grauman and transferring the plaintiffs without due process hearings.

The Replacement is a separate entity from the regular Luther Luckett Correctional Institution, although both use common fences and other administrative buildings. Both are in Oldham County, Kentucky, and are near the Kentucky State Reformatory, but are again separate from that institution. Replacement will seek to be accredited as a mental hospital.

Grauman had some security problems in the past. In particular, there was an escape of three patients on May 30, 1981, who left by merely breaking out a window and crawling through a hole in the fence. This security was criticized on more than one occasion by the Jefferson County grand jury.

Basing his decision on the criteria for issuing a preliminary injunction which this court has set out in *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977), the District Judge concluded that the plaintiffs had not shown "a strong or substantial likelihood or probability of success on the merits." The District Judge concluded "The Court has consulted all the authorities cited by the plaintiffs and it fails to see where the closing of the entire facility [Grauman] and the transferring of all the pre-trial detainees [to the Replacement Forensic Hospital Facility] would be a violation of the Constitution."

Subsequent to the actual transfer which took place on October 13, 1981, the plaintiffs filed a motion to amend their complaint to conform to the changed facts seeking as remedy a declaration that defendant's action in closing the Grauman Unit and transferring the plaintiffs to the Replacement Unit at the Luther Luckett Complex was unconstitutional. They also seek an order directing the reopening of the former with transfer back to Grauman of all patients previously transferred out. The District Court granted the motion to amend the complaint but subsequently denied any injunction pending appeal.

We now affirm the actions of the District Courts involved in this case up to the closing of this record. By so doing we, of course, pass no judgment upon the *operation* of the Replacement Hospital. All that we hold at this time is that we agree with the District Judges who have had contact with this case up-to-date that proofs of constitutional deprivation rights have not been established on the record written thus far.

The thrust of much of plaintiffs' argument has been that the transfer of the Psychiatric Unit from Central State Hospital to a building within the security arrangements for the Luther Luckett Correctional Complex, a medium security *prison* automatically deprived plaintiffs of constitutional rights. The argument appears to be that in spite of the fact that the same Department of Human Resources would be in charge of the new Replacement Forensic Hospital Facility, the mere fact that they were physically located within the outer perimeter of a medium security prison somehow constituted an abuse which violated the Federal Constitution. Since this record appears to show that the Replacement Unit has adequate space for the detainees to be housed there and adequate common space, we fail to see how the present record justifies federal intervention in the state's plans. To date plaintiffs have not alleged (much less provided proofs) that the operation of the forensic unit at the new location has resulted in more stringent confinement, worse living conditions or less acceptable medical treatment than had prevailed at Grauman.

We are highly aware that one of the two proposed classes of detainees are persons who have neither been convicted of crime nor found mentally incompetent or insane. They are however being held by court order for observation and diagnosis to determine whether they are mentally competent to stand trial. Neither at Grauman nor the Replacement do any of those detainees for whom the Replacement Unit is designed have the right to leave the hospital. At Grauman, however, it appears that security was such that some prisoners occasionally escaped. The State's prevention of such escapes by creating a higher security standard (described by plaintiffs as "maximum security") does not, without more, represent either "punishment" or constitutional violation. The Supreme Court of the United States in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), has, in its prevailing opinion, dealt extensively with claims of violation of the rights of pre-trial detainees who were plaintiffs in that case.

Directing its attention to the practice of placing two such pre-trial detainees in a 75 square foot cell originally intended for one, the Supreme Court rejected the Second Circuit's finding that this practice constituted "punishment of a person not yet convicted of a crime." The majority opinion's reasoning is set forth in part as follows:

> On this record, we are convinced as a matter of law that "double-bunking" as practiced at the MCC did not amount to punishment and did not, therefore, violate respondents' rights under the Due Process Clause of the Fifth Amendment.[24]
>
> Each of the rooms at the MCC that house pretrial detainees has a total floor space of approximately 75 square feet. Each of them designated for "double-bunking," see n. 4, *supra,* contains a double bunkbed, certain other items of furniture, a wash basin, and an uncovered toilet. Inmates generally are locked into their rooms from 11 p.m. to 6:30 a.m. and for brief periods during the afternoon and evening head counts. During the rest of the day, they may move about freely between their rooms and the common areas.

Based on affidavits and a personal visit to the facility, the District Court concluded that the practice of "double-bunking" was unconstitutional. The court relied on two factors for its conclusion: (1) the fact that the rooms were designed to house only one inmate, 428 F.Supp. [333] at 336–337; and (2) its judgment that confining two persons in one room or cell of this size constituted a "fundamental denia[l] of decency, privacy, personal security, and, simply, civilized humanity . . . ." *Id.* at 339. The Court of Appeals agreed with the District Court. In response to petitioners' arguments that the rooms at the MCC were larger and more pleasant than the cells involved in the cases relied on by the District Court, the Court of Appeals stated:

> "[W]e find the lack of privacy inherent in double-celling in rooms intended for one individual a far more compelling consideration than a comparison of square footage or the substitution of doors for bars, carpet for concrete, or windows for walls. The government has simply failed to show any substantial justification for double-celling." 573 F.2d [118] at 127.

We disagree with both the District Court and the Court of Appeals that there is some sort of "one man, one cell principle lurking in the Due Process Clause of the Fifth Amendment. While confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record.[25]

Detainees are required to spend only seven or eight hours each day in their rooms, during most or all of which they presumably are sleeping. The rooms provide more than adequate space for sleeping.[26] During the remainder of the time, the detainees are free to move between

572

their rooms and the common area. While "double-bunking" may have taxed some of the equipment or particular facilities in certain of the common areas, *United States ex rel. Wolfish v. United States,* 428 F.Supp. at 337, this does not mean that the conditions at the MCC failed to meet the standards required by the Constitution. Our conclusion in this regard is further buttressed by the detainees' length of stay at the MCC. See *Hutto v. Finney,* 437 U.S. 678, 686–87 [98 S.Ct. 2565, 2571, 57 L.Ed.2d 522] (1978). Nearly all of the detainees are released within 60 days. See n. 3, supra. We simply do not believe that requiring a detainee to share toilet facilities and this admittedly rather small sleeping place with another person for generally a maximum period of 60 days violates the Constitution.[27]

[24] The District Court found that there were no disputed issues of material fact with respect to respondents' challenge to "double-bunking." 428 F.Supp. at 335. We agree with the District Court in this determination.

[25] Respondents seem to argue that "double-bunking" was unreasonable because petitioners were able to comply with the District Court's order forbidding "double-bunking" and still accommodate the increased numbers of detainees simply by transferring all but a handful of sentenced inmates who had been assigned to the MCC for the purposes of performing certain services and by committing those tasks to detainees. Brief for Respondents 50. That petitioners were able to comply with the District Court's order in this fashion does not mean that petitioners' chosen method of coping with the increased inmate population—"double-bunking"—was unreasonable. Governmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional. See *Vance v. Bradley,* 440 U.S. 93 [99 S.Ct. 939, 59 L.Ed.2d 171] (1979); *Dandridge v. Williams,* 397 U.S. 471, 485 [90 S.Ct. 1153, 1161, 25 L.Ed.2d 491] (1970).

That Petitioners were able to comply with the District Court order also does not make this case moot, because petitioners still dispute the legality of the court's order and they have informed the Court that there is a reasonable expectation that they may be required to "double-bunk" again. Reply Brief for Petitioners 6; Tr. of Oral Arg. 33–35, 56–57; see *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–633 [73 S.Ct. 894, 897, 97 L.Ed. 1303] (1953).

[26] We thus fail to understand the emphasis of the Court of Appeals and the District Court

on the amount of walking space in the "double bunked" rooms. See 573 F.2d, at 127; 428 F.Supp. at 337.

[27] Respondents' reliance on other lower court decisions concerning minimum space requirements for different institutions and on correctional standards issued by various groups is misplaced. Brief for Respondents 41, and nn. 40 and 41; see, *e.g., Campbell v. McGruder,* 188 U.S.App.D.C. 258, 580 F.2d 521 (1978); *Battle v. Anderson,* 564 F.2d 388 (CA10 1977); *Chapman v. Rhodes,* 434 F.Supp. 1007 (SD Ohio 1977); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (Mass.1973); American Public Health Assn., Standards for Health Services in Correctional Institutions 62 (1976); American Correctional Assn., Manual of Standards for Adult Correctional Institutions, Standard No. 4142, p. 27 (1977); National Sheriff's Assn., A Handbook on Jail Architecture 63 (1975). The cases cited by respondents concerned facilities markedly different from the MCC. They involved traditional jails and cells in which inmates were locked during most of the day. Given this factual disparity, they have little or no application to the case at hand. Thus, we need not and do not decide whether we agree with the reasoning and conclusions of these cases. And while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question. For this same reason, the draft recommendations of the Federal Corrections Policy Task Force of the Department of Justice regarding conditions of confinement for pretrial detainees are not determinative of the requirements of the Constitution. See Dept. of Justice, Federal Corrections Policy Task Force, Federal Standards for Corrections (Draft, June 1978).

In summary, the *Bell v. Wolfish* majority concluded:

> Therefore, the determination whether these restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose. * * * *Ensuring security and order at the institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates,* or both.

*Id.,* 441 U.S. at 561, 99 S.Ct. at 1885 (emphasis added).

We recognize that there were strong opposing views expressed in dissent on the

part of three justices. This court must, however, follow the Court's majority opinion as the applicable rule of law.

We have also considered a thoughtful post-*Bell v. Wolfish* opinion from the Seventh Circuit in *Lock v. Jenkins,* 641 F.2d 488 (7th Cir.1981). The operational facts established on the record before Judge Fairchild and his panel are in marked contrast to the absence of same in our present case.

The judgment of the District Court is affirmed.